IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SHANISE L. SLEDGE | : | |
| | : | |
| v. | : | Civil Action No. DKC 20-3384 |
| | : | |
| LIUNA LOCAL 11 | : | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is a motion for summary judgment filed by Defendant Liuna Local Union 11 ("Local 11").[1]  (ECF No. 59).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion for summary judgment will be granted.

**I.  Background**

**A. Factual Background**

Unless otherwise noted, the following facts are undisputed. Plaintiff began her employment as a union laborer for Essex Construction, LLC ("Essex") on or about July 5, 2016, working on the MGM National Harbor Casino Resort Project.  (ECF No. 59-5, at 2).  Essex had a Collective Bargaining Agreement ("CBA") with Local 11, and Plaintiff was a dues-paying member of Local 11 during her

---

[1]  Defendant says that Liuna is shorthand for its full name, Construction and Master Laborers' Local Union 11. (ECF No. 59-1, at 1).

employment with Essex.  (ECF No. 59-2, at 1-3).  Under the CBA, Essex had the right to select all supervisors and the "sole responsibility for selecting the employees to be laid off, discharged, suspended[,] or disciplined for proper cause." (ECF No. 59-2, at 2, 33).

Plaintiff requested the assistance of Local 11 Representative Jhunio Medina on several occasions during her employment with Essex.  (ECF No. 59-7, at 18).[2]  At one point, she asked for his assistance in obtaining a "light duty" work assignment to accommodate her medical needs, and Mr. Medina helped her negotiate an initial assignment and then an adjusted assignment when Plaintiff was unhappy with the initial assignment.  (ECF No. 59-7, at 13-14).  On another occasion, Mr. Medina investigated a verbal altercation between Plaintiff and a male co-worker, Robbin Bruce, in which Plaintiff felt physically threatened.  (ECF No. 59-7, at 21).  Mr. Medina also helped Plaintiff when she had an issue with her paycheck.  (ECF No. 59-7, at 22).  Plaintiff felt that she was being teased and treated poorly by co-workers because of her frequent complaints to Mr. Medina, including being called names such as "snitch" and "spoiled princess."  (ECF No. 59-7, at 14, 17, 20).  At one point, Plaintiff asked Mr. Medina to be

---

[2] This memorandum opinion cites to Plaintiff's deposition transcript using the ECF page numbering rather than the page numbering contained in the transcript itself, even though each ECF page contains four transcript pages.

reassigned to another project or employer because of this treatment, but she shortly thereafter advised Mr. Medina that she wanted to "stick it out." (ECF No. 59-7, at 30-31, 50).

Plaintiff worked for multiple different supervisors at Essex. (ECF No. 59-7, at 14). One of her supervisors was Dwayne Holland, the General Foreman who supervised the general laborers for Essex. (ECF Nos. 59-5, at 3; 59-7, at 5). One of Plaintiff's responsibilities was completing paperwork for Mr. Holland. (ECF No. 59-7, at 5-6). Mr. Holland made Plaintiff feel uncomfortable through his "vulgar" comments about women. (ECF No. 59-7, at 6). Mr. Holland also made inappropriate comments about Plaintiff, including requests that she join him in his hotel room and remarks about her lipstick being on his penis. (ECF No. 59-7, at 6, 8, 36). Mr. Holland sent Plaintiff a text message on August 2, 2016, that he wanted to "see [Plaintiff] on [her] knees." (ECF Nos. 59-7, at 7, 44). Plaintiff did not report the text message to Essex or Mr. Medina at the time she received it. (ECF No. 59-7, at 8, 25).

On October 20, 2016, Plaintiff had a conversation with Susan Kingsberry, the bookkeeper for Essex, about the altercation with Mr. Bruce and the paycheck issue, and she "complained that she was being slighted because she was a woman." (ECF No. 59-6, at 1-2). It is unclear whether Plaintiff told Ms. Kingsberry at that time about the sexual comments and messages she had received from Mr.

Holland.  (ECF No. 59-7, at 23-24).  Ms. Kingsberry described her conversation with Plaintiff in an email the next day to Anthony Moore, the Vice President of Operations at Essex.  (ECF No. 59-6, at 7).

At 6:59 a.m. on October 24, 2016, Mr. Medina received a text message from Mr. Holland that he would be laying off 10 to 15 employees the next day, but the message did not specify who those workers would be.  (ECF No. 59-3, at 7).  Mr. Medina received a phone call from Plaintiff later that day, during which Plaintiff told Mr. Medina that her supervisor at the time, James Dorsey, had threatened to write her up for an incident two days prior, and she also complained about an issue with her paycheck.  (ECF No. 59-3, at 3).  Mr. Medina travelled to the work site to sort out these issues.  After doing so, he spoke to Plaintiff individually.  It was at that time that Plaintiff showed Mr. Medina the inappropriate text message she had received from Mr. Holland in August.[3]  Mr. Medina asked Plaintiff why she had not shown him the message sooner, and Plaintiff said she did not know why.  (ECF Nos. 59-3, at 3; 59-7, at 25).  Mr. Medina asked Plaintiff to forward him the text message and told her that he would investigate and take care of it.  (ECF Nos. 59-7, at 24-25; 59-4, at 2).

---

[3] According to Mr. Medina's affidavit, Plaintiff never told Mr. Medina about any of the other inappropriate comments Mr. Holland made to her.  (ECF No. 59-4, at 2).

The next day, on October 25, 2016, Plaintiff received a text message from another supervisor, Anthony Simms, telling her that she had been laid off. (ECF No. 59-7, at 25). Nine other laborers were laid off on the same day. (ECF No. 59-5, at 4). According to the Vice President of Operations at Essex, Essex was steadily reducing its workforce at this time, as Essex's work on the project neared its completion date of December 16, 2016. (ECF No. 59-5, at 5). Plaintiff was aware that the project was "winding down" at that time. (ECF No. 59-7, at 27).

Plaintiff left a message for Mr. Medina on October 26, 2016, saying that it was "very strange" that she had been laid off one day after showing him the text message from Mr. Holland. (ECF No. 59-3, at 9). Plaintiff also called Essex that day and spoke with Nancy Barahona, the receptionist. (ECF No. 59-6, at 4). Plaintiff told her about the text message from Mr. Holland and also referenced the teasing and poor treatment by other co-workers. Ms. Barahona described this conversation in an email to Ms. Kingsberry. (ECF No. 59-6, at 8).

Later that same day, Ms. Kingsberry called Plaintiff to let her know that Essex was offering to reinstate her to her previous position, supervised by Anthony Simms. (ECF Nos. 59-6, at 5; 59-7, at 27). Plaintiff asked whether Essex could "assure that [she] will be safe," and Ms. Kingsberry responded that Essex could not "make that promise." (ECF No. 59-7, at 27). Plaintiff rejected

the offer of reinstatement.  She explained in her deposition that she did not think that Mr. Simms could keep her safe from Mr. Holland and others who posed a danger to her.  She went on to say that "no one could keep [her] safe" if she returned, and she added that she "also maybe want[ed] just another position" under a "different employer" where she did "not have to deal with everybody's calling [her] all types of names every day."  (ECF No. 59-7, at 27-28).

At some point, Mr. Medina spoke with Mr. Moore about the text message and said that Essex "should investigate."  (ECF No. 59-4, at 3).  It is unclear when this conversation occurred.  Mr. Moore told Mr. Medina that Essex already knew about the complaint and had offered Plaintiff her job back, but Plaintiff had rejected the offer.  Mr. Medina spoke with Plaintiff, and she confirmed this.  Plaintiff never asked Mr. Medina to file a grievance on her behalf or to take any other action with regard to Essex.  (ECF Nos. 59-3, at 4; 59-4, at 3).  Essex investigated the text message incident, and Plaintiff completed an "Employee Complaint/Incident Report Form" and provided a written statement.  (ECF No. 59-5, at 6, 18-28).  Mr. Holland also provided a written statement.  (ECF No. 59-5, at 29).  After completing its investigation, Essex disciplined Mr. Holland by issuing him a "first and final warning" on December 14, 2016.  (ECF No. 59-5, at 7, 30).

After Plaintiff rejected Essex's offer of reinstatement, she repeatedly asked Mr. Medina to reassign her to another project. (ECF No. 59-3, at 4).  Local 11 did not have the ability to reassign her to another project immediately upon her request, but it enrolled her on the "out-of-work list" so that she could be referred to jobs as they came available.  (ECF Nos. 59-3, at 4-5; 59-7, at 29).  Local 11 refers its members for employment with contractors using a "Uniform Hiring Hall" procedure.  (ECF No. 59-2, at 2).  Under this procedure, out-of-work members are placed on one of four lists based on their experience and skill level and are ranked in order of the date of their enrollment on the list. (ECF No. 59-2, at 2, 50-54).  Plaintiff was placed on the "C" list— the list for members "with at least 500 hours but less than 3,200 hours of employment as a construction laborer in the three (3) most recent years."  (ECF Nos. 59-2, at 51; 59-3, at 5).  As of November 16, 2016, Plaintiff was number 98 on the combined list. (ECF No. 59-2, at 3, 66).

Plaintiff only paid her union dues through the end of November 2016.  (ECF No. 59-2, at 3).  Therefore, she was only eligible for referral by Local 11 until then.  According to Local 11, the only contractor who requested Local 11 to refer employees during the time Plaintiff was on the out-of-work list was Kiewit Construction ("Kiewit"), which requested six laborers for the "Cove Point

Project" on November 9, 2016.[4]  (ECF No. 59-2, at 3, 72).  Plaintiff
was not referred to this job.  However, Plaintiff's mother was
referred to the job, despite the fact that she was not on the out-
of-work list.  (ECF No. 59-2, at 3).  Later that month, Plaintiff's
family members told her that Kiewit needed additional laborers for
the Cove Point Project, and they advised her to call a Local 11
representative named "Mr. Miguel" to ask for a job.  (ECF No. 59-
7, at 33, 57).  Plaintiff did so, although it is unclear exactly
when, and Mr. Miguel told her there was "a problem with [her]
paperwork" and asked whether she had paid her union dues.  (ECF
No. 59-7, at 33).  Plaintiff was also told she "had to go through
to the Virginia office," and it was at that point that she stopped
trying to pursue that job.  (ECF No. 59-7, at 35).

### B. Procedural Background

On  November  3,  2016,  Plaintiff  filed  a  charge  of
discrimination against Local 11 with the United States Equal
Employment Opportunity Commission ("EEOC").  (ECF No. 66-2).  She
checked the box indicating that the discrimination was based on
"race," but she described the sexual harassment she experienced
from Mr. Holland and the treatment she had received from other co-

---

[4] In a prior opinion, the court referenced this project as
the "Kiewit Pipelines Project," which is how Plaintiff described
it in her complaint.  Plaintiff clarifies in her response to
Defendant's motion that "Cove Point" is another name for the Kiewit
project.  (ECF No. 66, at 10).

workers.   She also described that she requested to be placed on light duty but was still assigned regular work duties.   She complained that Local 11 did not take action to address her concerns.

The EEOC issued a Letter of Determination on October 17, 2019, finding "reasonable cause to believe that [Plaintiff] was subjected to sexual harassment and laid off in retaliation for complaining of discrimination," but making no findings as to the other allegations. (ECF No. 1-1, at 2).   After Local 11 responded to the EEOC that it was not Plaintiff's employer, the EEOC issued a "Notice of Intent to Reconsider," noting that error and explaining that a labor organization cannot be held liable for sexual harassment by a member's employer of which it had no knowledge. (ECF No. 1-1, at 3).   The Notice concluded with a determination "that the sexual harassment was not ongoing when [Local 11] became aware of the conduct and therefore [Local 11] cannot be held liable for the conduct."   The EEOC issued a right to sue letter on August 31, 2020. (ECF No. 1, at 9).

Plaintiff filed this lawsuit on November 24, 2020, asserting claims under Title VII and 42 U.S.C. §§ 1981, 1981a.[5]   (ECF Nos.

---

[5] Plaintiff has not made any separate arguments or claims that are specific to her § 1981 claim, and the same legal framework that applies in Title VII cases generally applies in discrimination cases arising under § 1981.   *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   Therefore, if summary judgment is granted on Plaintiff's Title VII claims, her § 1981

1, at 4-5; 1-2, ¶ 3).  She seeks compensatory damages, attorney's fees, and costs.  (ECF No. 1, at 7).  Defendant moved to dismiss Plaintiff's Title VII claims on July 1, 2021.  (ECF No. 25).  The court granted Defendant's motion in part and denied it in part on March 2, 2022.  The court construed Plaintiff's complaint as raising three Title VII sex discrimination claims—failure to act on complaints of sexual harassment and retaliation, failure to refer for job openings, and active support of a hostile work environment—and a retaliation claim.  The court dismissed Plaintiff's claim that Local 11 actively supported a hostile work environment.  (ECF Nos. 30, 31).

Defendant moved for summary judgment on Plaintiff's remaining claims on November 21, 2022.  (ECF No. 59).  Plaintiff responded in opposition, and Defendant replied.[6]  (ECF Nos. 66, 69).

## II.  Standard of Review

A court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A genuine dispute about a material fact

---

claim falls as well.  Additionally, Section 1981a does not give rise to an independent cause of action.  *See Pollard v. Wawa Food Mkt.*, 366 F.Supp.2d 247, 251-52 (E.D.Penn. 2005).

[6] Plaintiff was previously acting *pro se*, but she has been represented by counsel since June 17, 2022.  (ECF No. 45).

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To withstand summary judgment, the nonmoving party must come forward with "sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  The court must "view the evidence in the light most favorable to . . . the nonmovant[] and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III. Analysis

Plaintiff's remaining Title VII claims are that Local 11 discriminated against her on the basis of her sex by (1) failing to respond adequately to Plaintiff's complaints of sexual harassment and retaliation by her employer, (2) refusing to refer her for another job after she was laid off, and (3) retaliating against her by preventing her from being reassigned to another job.  Title VII makes it unlawful for a labor union:

> (1) to exclude or to expel from its
> membership, or otherwise to discriminate
> against, any individual because of his race,
> color, religion, sex, or national origin; (2)
> to . . . classify or fail or refuse to refer
> for employment any individual, in any way
> which would deprive or tend to deprive any
> individual of employment opportunities, or
> would limit such employment opportunities or
> otherwise adversely affect his status as an
> employee or as an applicant for employment,
> because of such individual's race, color,
> religion, sex, or national origin; or (3) to
> cause or attempt to cause an employer to
> discriminate against an individual in
> violation of this section.

42 U.S.C. § 2000e-2(c).

### A. Failure to Act on Reports of Discrimination

Plaintiff claims that Local 11 violated Title VII by failing to take proper remedial action in response to her report that Essex was discriminating against her. A labor union can be liable for engaging in discrimination under § 2000e-2(c)(1) by deliberately choosing not to pursue a sexual harassment grievance on behalf of a union member. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667 (1987); *see also Murphy v. Adams*, No. 12-cv-1975-DKC, 2014 WL 3845804, at *11 (D.Md. Aug. 4, 2014).

This court explained in *Murphy* that although the United States Court of Appeals for the Fourth Circuit has not established the elements of a Title VII claim against a union for failure or refusal to pursue a grievance for a member's discrimination claim, some courts analyzing this kind of claim "have required a plaintiff

to demonstrate that: (1) she had a meritorious claim of discrimination; (2) she affirmatively requested that her union intervene to remedy the alleged discrimination; and (3) her union deliberately refused or failed to act on that request for discriminatory reasons." *Murphy*, 2014 WL 3845804, at *12 (collecting cases). As the court in *Murphy* noted, if a union deliberately ignores discrimination of which it is aware, an "inference that the union acted with a discriminatory motive can be drawn without comparator evidence." *Id.* (citing *Young-Smith v. Bayer Health Care, LLC*, 788 F.Supp.2d 792, 807 n.10 (N.D.Ind. 2011)).

Here, Defendant's motion does not discuss whether Plaintiff had a meritorious claim of discrimination against her employer, Essex. Instead, Defendant argues that the undisputed facts establish that it was not aware of any alleged sexual harassment until October 24, 2016, and that once it learned of the alleged discrimination, it responded appropriately. (ECF No. 59-1, at 22).

Plaintiff argues that Local 11 "received notice of a discrimination complaint based on gender from the Plaintiff on October 21, 2016," referring to the conversation Plaintiff had with Ms. Kingsberry about her feelings of mistreatment "because she is a woman." (ECF No. 66, at 10). As Defendant points out, Ms. Kingsberry was a bookkeeper for Essex, not Local 11, and the

record reflects that she shared the contents of the conversation with Mr. Moore, not Mr. Medina.  (ECF No. 59-6, at 2, 7).  There is no evidence in the record that Mr. Medina or anyone else at Local 11 was made aware of complaints of gender discrimination or sexual harassment before October 24, 2016, when Plaintiff showed Mr. Medina the text message from Mr. Holland.  To the extent Plaintiff's complaints to Mr. Medina about the teasing and name-calling she received from other co-workers for frequently complaining to Local 11 can be construed as complaints of gender discrimination, there is no evidence—and Plaintiff does not argue—that Plaintiff requested Local 11 to pursue a grievance based on that conduct.  Instead, the record reflects that Plaintiff told Mr. Medina she wanted to "stick it out" rather than try to find a new job.  (ECF No. 59-7, at 30, 50).

It is also unclear that when Plaintiff showed Mr. Medina the text message from Mr. Holland, she affirmatively requested Local 11 to intervene to remedy the sexual harassment or file a grievance on her behalf.  Assuming she did request Local 11 to act on her complaint, the record reflects that Mr. Medina reached out to Essex about the text message and learned that Essex was investigating the complaint and had already offered Plaintiff her job back.  (ECF No. 59-4, at 3).  Plaintiff confirms that she rejected the offer of reinstatement and instead wanted to find a job on another project with a different employer.  (ECF No. 59-7, at 27-28).

There is no evidence in the record to suggest that Plaintiff asked Local 11 to pursue any other remedy with regard to her employment at Essex at that point.

Despite this, Plaintiff contends that Local 11 failed to respond appropriately because it refused to "reinstate the Plaintiff under a different supervisory chain" at Essex. (ECF No. 66, at 13). She argues that the offer to reinstate Plaintiff under Anthony Simms was a "useless" remedy because Mr. Simms worked under Mr. Holland, who "was still the General Foreman and would have continued in that capacity, with supervisory authority over the Plaintiff."[7]

Plaintiff's argument that Local 11 violated Title VII by not securing her reinstatement under a different supervisory chain fails for a few reasons. First, the record reflects that Local 11 did not have the authority to determine unilaterally Plaintiff's supervisory chain, as Essex had the sole responsibility for doing

---

[7] It is undisputed that Plaintiff was offered reinstatement at her job with Essex under the supervision of Mr. Simms, with Mr. Holland still employed as General Foreman. Plaintiff attempts to identify a dispute of material facts as to whether Plaintiff was offered reinstatement with Mr. Holland still in her "supervisory chain," pointing to slight inconsistencies in the descriptions of what Plaintiff was offered in Defendant's 30(b)(6) witness's testimony and Mr. Medina's affidavit. (ECF No. 66, at 3). This purported dispute is immaterial; Plaintiff testified that Essex offered to reinstate her under Mr. Simms with Mr. Holland still employed as General Foreman, so to the extent there is any confusion about what Plaintiff was offered, her version of events controls here.

so under the CBA.  (ECF No. 59-2, at 2, 33).  Second, Plaintiff's own testimony reflects that it would have been impossible for her to be reinstated under a different supervisory chain—given that Mr. Holland oversaw all the laborers as General Foreman—without Mr. Holland being removed from his position with Essex.  (ECF No. 59-7, at 5).  Again, Local 11 did not have the authority to remove Essex employees unilaterally.  (ECF No. 59-2, at 2, 33).  Most importantly, Plaintiff testified that she felt that "no one could keep [her] safe" if she returned to work for Essex and that she "also maybe want[ed] just another position" under a "different employer" where she did "not have to deal with everybody's calling [her] all types of names every day."  (ECF No. 59-7, at 27-28).  Thus, not only was it infeasible for Local 11 to secure Plaintiff's reinstatement under a different supervisory chain, but Plaintiff did not want or ask Local 11 to do so after she received the offer of reinstatement under Mr. Simms—instead, she rejected the reinstatement offer and asked to be assigned to work somewhere else.  Local 11 could not be expected to seek a remedy on Plaintiff's behalf that Plaintiff did not want or request.

Finally, even if Plaintiff had affirmatively asked Local 11 to try to persuade Essex to suspend Mr. Holland or remove him from her supervisory chain, Plaintiff has not come forward with any evidence that Local 11's decision not to do so was for discriminatory reasons.  Far from deliberately ignoring

16

Plaintiff's complaint, Mr. Medina asked her to forward him the text message and followed up with Essex about investigating Mr. Holland's conduct, which Essex did.  His decision not to pursue any additional remedies with Essex once Plaintiff rejected the offer of reinstatement and asked to be placed on the out-of-work list, without more, is insufficient to create an inference of discriminatory motive.  *See Byrd v. Baltimore Sun Co.*, 279 F.Supp.2d 662, 673 (D.Md. 2003), *aff'd*, 110 F.App'x 365 (4th Cir. 2004) ("The Union's decision not to pursue these issues further is a reflection of their merit as arbitrable issues and not evidence of discrimination or retaliation.").

Thus, Plaintiff has failed to come forward with enough evidence that would allow her to succeed on this claim at trial.

### B. Refusal to Refer to Job Openings

Plaintiff also claims that Local 11 discriminated against her in its refusal to refer her for job openings.  A labor union can be liable under § 2000e-2(c)(1) for "fail[ing] or refus[ing] to refer for employment any individual[] in any way which would deprive or tend to deprive [that] individual of employment opportunities . . . because of [her] sex."  42 U.S.C. § 2000e-2(c)(1).  Plaintiff's complaint alleges that after she "was laid off, [Local 11] failed to assist her in securing another position" and that it "prevented [her] from working on the" Cove Point Project.  (ECF No. 1-2, at 2).  Plaintiff does not dispute

that the Cove Point Project was the only project to which Local 11 could have referred her between the date of her layoff, October 25, 2016, and the end of November 2016, when Plaintiff stopped paying her union dues. Defendant argues that the undisputed evidence shows that it adhered to its Uniform Hiring Hall procedure in not referring Plaintiff to the Cove Point Project and therefore did not discriminate against her.

Plaintiff argues that there are material facts in dispute regarding whether Local 11 routinely followed the Uniform Hiring Hall procedures in referring members to projects. She cites deposition testimony by her aunt, Rhonda Chase, who was also a Local 11 member, about Local 11's frequent deviations from the referral procedures. Ms. Chase testified about several occasions where union members were referred to projects based on personal relationships with others who were already working on those projects rather than on their positions on the out-of-work list. For example, Ms. Chase testified that when she asked Local 11 whether she could bring family members with her to projects she worked on, "[n]ine times out of ten" Local 11 had "to see if they're on the list," and even if they were not, "[s]ometime[s] they g[o]t in, sometime[s] they d[id]n't." (ECF No. 66-5, at 67). Plaintiff also notes that Plaintiff's mother was one of the six members referred to the Cove Point Project, despite her not being

on the out-of-work list.  Defendant admits that Plaintiff's mother was "mistakenly" referred to that job.  (ECF No. 59-2, at 3).

Plaintiff has come forward with evidence—albeit anecdotal—that Local 11 at least sometimes deviates from its Uniform Hiring Hall procedure when it refers its members for jobs.  Even if Local 11 did not follow any kind of uniform procedure in referring members to projects and only referred them based on request and personal connections, there is no evidence that Local 11's failure to refer Plaintiff to the Cove Point Project was based on her sex.  The record reflects that Local 11 was only asked to refer six members to the Cove Point Project, so Local 11's choice of six members other than Plaintiff out of the dozens of members on the out-of-work list is hardly an adverse action against Plaintiff.  Plaintiff has not produced any evidence that she requested to be one of the six members referred to that project at that time.[8]

---

[8] In her complaint, Plaintiff referenced the fact that Local 11 asked her about her dues payments when she later requested to join the Cove Point Project after hearing from family members that the project needed additional workers beyond the six initially requested from Local 11.  Plaintiff has come forward with no evidence that Local 11 ever refused to refer her to that project after she requested to join it.  Instead, Plaintiff's deposition testimony reflects only that Local 11 asked that she confirm she had paid her union dues and told her she would need to go to the Virginia office, which caused Plaintiff to lose interest in the job.  (ECF No. 59-7, at 33, 35).  Possibly for this reason, Plaintiff's response to Defendant's motion does not rely on the events that occurred after Plaintiff inquired about the project.  Plaintiff also does not rely on her previous requests for reassignment while she worked at Essex, which she later withdrew by telling Mr. Medina that she wanted to "stick it out."

Additionally, the only person Plaintiff identifies that was improperly referred to the Cove Point Project was her mother, a union member of the same sex as Plaintiff. Because Plaintiff stopped paying her union dues after November 2016 and was thereafter no longer eligible for referral to jobs, Local 11's failure on one occasion to select her from the out-of-work list is not enough evidence of discrimination to preclude summary judgment on this claim.

### C. Retaliation

Finally, Plaintiff's complaint alleges that Local 11 retaliated against her when it "failed to relocate or reassign Ms. Sledge after multiple complaints of [h]ostile work environment and sex harassment." (ECF No. 1-2, at 2). In order to make out a claim for retaliation, Plaintiff must show "(i) that [she] engaged in protected activity, (ii) that [the labor organization] took adverse action against [her], and (iii) that a causal relationship existed between the protected activity and the adverse . . . activity." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *see also Beck-Pell v. Sheet Metal Workers Loc. #100*, No. 17-cv-2329-PWG, 2019 WL 3841935, at *7 (D.Md. Aug. 15, 2019).

As previously discussed, the record indisputably indicates that Local 11 learned of Plaintiff's sexual harassment allegations based on Mr. Holland's text message for the first time on October

24, 2016, and that Plaintiff had rescinded her prior requests for reassignment based on the teasing and name-calling by telling Mr. Medina she wanted to "stick it out."   Therefore, Plaintiff's retaliation claim can only relate to Local 11's failure to refer her for other jobs after October 24, 2016, and before she stopped paying dues at the end of November 2016.  Again, the only project to which Plaintiff could have been referred during this time was the Cove Point Project.  For many of the reasons already discussed, Plaintiff has not produced enough evidence that Local 11's failure to choose her from the out-of-work list for one of the six spots available for the Cove Point Project was retaliatory.   Even if that non-referral on one occasion can be considered an adverse action, there is no evidence of a causal connection between Plaintiff's complaint of discrimination and Local 11's choice to refer six other members to that project instead of Plaintiff, who at that point was number 98 on the out-of-work list and had not otherwise sought referral to that project.[9]

---

[9] In a prior memorandum opinion, the court referenced an allegation contained in Plaintiff's EEOC charge that Mr. Medina told her on October 24, 2016, that she was "too emotional at work" and that she needed to "have thick skin" to work in construction as possible evidence of retaliatory animus.  (ECF Nos. 30, at 16; 25-1, at 38-39).  However, Mr. Medina stated in his affidavit that the conversation wherein he told Plaintiff she needed to have thick skin occurred *before* Plaintiff accepted the job assignment at MGM Casino.  (ECF No. 59-3, at 3).  Plaintiff has provided no evidence to contradict this version of events.  Indeed, Plaintiff's deposition testimony is consistent with a conclusion that Mr. Medina made the "thick skin" comment much earlier than October 24,

Plaintiff argues that summary judgment should be denied with respect to the retaliation claim because Plaintiff was not "offered her job back without assurance that she would have been protected from Holland." (ECF No. 66, at 17). This argument fails for the reasons already discussed. Plaintiff does not attempt to provide any additional support for the missing elements of her retaliation claim. Thus, there is insufficient evidence of retaliation to allow Plaintiff to prevail on this claim at trial.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

2016. (ECF No. 59-7, at 31). Therefore, this comment cannot serve as evidence of causation in Plaintiff's retaliation claim.

Additionally, Mr. Medina states in his affidavit that he was not involved in the referrals to the Cove Point Project. (ECF No. 59-4, at 3).